DENNIS JACOBS, Chief Judge,
concurring in the denial of panel rehearing:
I concur in the denial of panel rehearing, for the following reasons. Having subscribed to Judge Cabranes’s sound and elegant opinion, I see no reason to revisit its argument. At the same time, I acknowledge that Judge Leval’s opinion is worked out with a certain scholarly force, and has an academic constituency. By this concurring opinion, however, I subject Judge Leval’s conclusion to some tests of reality.
A
Judge Leval’s opinion argues in favor of corporate liability under the Alien Tort Statute (“ATS”), 28 U.S.C. § 1350, for violations of the norms of customary international law. It is not argued that this remedy is consistent with international practice, or even known to any country or court beyond our borders. Instead, Judge Leval argues that “the law of nations ... leav[es] it to each State to resolve questions of civil liability ...” and that “international law leaves the manner of remedy to the independent determination of each State.” Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 175, 176 (2d Cir.2010) (Leval, J., concurring). Judge Leval’s opinion thus rests on the idea that no account need be taken of how customary international law is enforced in our courts.
That proposition can be tested. The pirate is the enemy of all mankind and offends international norms that are universal among civilized countries; so the United States should have no trouble achieving extradition of a pirate. But if the remedy in this country entails capital punishment, one would soon see that other nations have a lively interest in the processes and remedies afforded under United States law, an interest apart from the bare classification of piracy as violative of a norm of customary international law. See, e.g., Soering v. United Kingdom, 161 Eur. Ct. H.R. 8 (ser.A) (1989) (refusing to extradite a German national from the United Kingdom to the United States on murder charges, citing the European Convention on Human Rights, on the ground that the “death row phenomenon” is inhumane or degrading treatment); Agreement on Extradition Between the European Union and the United States of America art. 13, U.S.-Eur. Union, June 25, 2003, S. Treaty Doc. No. 109-14 (“Where the of-fence for which extradition is sought is punishable by death under the laws in the requesting State and not punishable by death under the laws in the requested State, the requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or if for procedural reasons such condition cannot be complied with by the requesting State, on condition that the death penalty if imposed shall not be carried out.”).
B
“[Cjustomary international law is composed only of those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual con *270 cern.” Flores v. S. Peru Copper Corp., 414 F.3d 233, 248 (2d Cir.2003). The marked characteristic of the whole system is a commonality of interest aligned against the enemies of all mankind. The idea of corporate liability does not withstand scrutiny in that light.
All the cases of the class affected by this case involve transnational corporations, many of them foreign. Such foreign companies are creatures of other states. They are subject to corporate governance and government regulation at home. They are often engines of their national economies, sustaining employees, pensioners and creditors — and paying taxes. I cannot think that there is some consensus among nations that American courts and lawyers have the power to bring to court transnational corporations of other countries, to inquire into their operations in third countries, to regulate them — and to beggar them by rendering their assets into compensatory damages, punitive damages, and (American) legal fees. Such proceedings have the natural tendency to provoke international rivalry, divisive interests, competition, and grievance — the very opposite of the universal consensus that sustains customary international law.
The imposition of liability on corporations, moreover, raises vexed questions. What employee actions can be imputed to the corporation? What about piercing the corporate veil? Can these judgments be discharged in bankruptcy, and, if so, in the bankruptcy courts of what country? Punitive damages is a peculiar feature of American law; can they be exacted? These issues bear on the life and death of corporations, and are of supreme consequence to the nations in which the defendant corporations were created, make their headquarters, and pay their taxes. Is it clear that the nations of the earth would be complacent about having these matters decided in U.S. courts?
The dominant view elsewhere is well expressed by former South African President Thabo Mbeki, who, prior to our decision in Khulumani v. Barclay Nat’l Bank Ltd., 504 F.3d 254 (2d Cir.2007), said: “We consider it completely unacceptable that matters that are central to the future of our country should be adjudicated in foreign courts which bear no responsibility for the well-being of our country....” President Thabo Mbeki, Statement by President Thabo Mbeki to the National Houses of Parliament and the Nation, on the Occasion of the Tabling of the Report of the Truth and Reconciliation Commission (Apr. 15, 2003). Later, President Mbeki decried the Khulumani decision as a form of “judicial imperialism,” President Thabo Mbeki, Response to National Assembly Question Paper (Nov. 8, 2007), because it “implfied] that U.S. courts are better placed to judge the pace and degree of South Africa’s national reconciliation.” Khulumani, 504 F.3d at 295 (Korman, J., dissenting) (internal quotation marks and citations omitted).
By definition, no one would protect any enemy of all mankind, so it is telling that each and every country does protect and foster the companies that fuel its national economy and that project its economic power and interests under such regulation as each country deems sufficient. These policy considerations explain why no international consensus has arisen (or is likely to arise) supporting corporate liability. Is it plausible that customary international law supports proceedings that would harm other civilized nations and be opposed by them — or be tantamount to “judicial imperialism”?
C
In this Circuit, the underlying question of law is one of no big consequence. That *271 is because of our opinion in Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244 (2d Cir.2009), which holds that aiding and abetting liability does not lie under the ATS unless the conduct is done with the positive intention of bringing about a violation of the Law of Nations. Id. at 259. So, unless a company has purposefully engaged in the business of genocide, slavery, piracy, etc., there can be no corporate liability under that statute in this Circuit. The incremental number of cases actually foreclosed by the majority opinion in Kiobel approaches the vanishing point.
Judge Leval’s opinion concurring in the judgment of the Court posits the idea that slavers and pirates will now rush into corporate transactions. Kiobel, 621 F.3d at 155-56 (Leval, J., concurring). But that is fanciful.[1] Examples of corporations in the atrocity business are few in history.[2] Maybe one day, pirate corporations will proliferate; if so, however, an international consensus may come to consider the principle of corporate liability.
The holding of this case matters nevertheless because, without it, plaintiffs would be able to plead around Talisman in a way that (notwithstanding Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and Ashcroft v. Iqbal, — U.S. -, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)) would delay dismissal of ATS suits against corporations; and the invasive discovery that ensues could coerce settlements that have no relation to the prospect of success on the ultimate merits. American discovery in such cases uncovers corporate strategy and planning, diverts resources and executive time, provokes bad public relations or boycotts, threatens exposure of dubious trade practices, and risks trade secrets. I cannot think that other nations rely with confidence on the tender mercies of American courts and the American tort bar. These coercive pressures, combined with pressure to remove contingent reserves from the corporate balance sheet, can easily coerce the payment of tens of millions of dollars in settlement, even where a plaintiffs likelihood of success on the merits is zero. Courts should take care that they do not become instruments of abuse and extortion. If there is a threshold ground for dismissal— and Kiobel is it — it should be considered and used.
In short, this case has no great practical effect except for the considerable benefit of avoiding abuse of the courts to extort settlements. Judge Leval, passim, reads my words as giving absolution to moral monsters. For the record: even moral monsters are humans, and I would happily see them hanged.
The majority opinion demonstrates why ATS suits against corporations are foreclosed. It is a matter of great importance to say so, in order to promote international comity, to administer efficient handling of *272 cases, and to avoid the use of our courts to extort settlements.
I therefore vote to deny panel rehearing.
JOSÉ A. CABRANES, Circuit Judge,
concurring in the denial of panel rehearing:
The questions of policy raised by my colleagues in response to the motion for panel rehearing are plainly important. The ATS covers, by definition, some of the most disgusting conduct of which man is capable. It is unsurprising that concern for the consequences of its reach engenders passion in all corners. But fidelity to the law, not a “policy agenda,” dictated the majority opinion. Contra Judge Leval’s Opinion Dissenting from Denial of Panel Rehearing 272. The text and history of the Aien Tort Statute, under our precedent— and that of the Supreme Court — requires that “violations of the law of nations,” 28 U.S.C. § 1350, be defined by reference to international norms that are “specific, universal, and obligatory.” Sosa v. Alvarez-Machain, 542 U.S. 692, 732, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). That is, the scope of our subject matter jurisdiction under the ATS — who is liable for what — is determined by customary international law. Because corporate liability is not a discernible, much less universal, norm of customary international law, it cannot form the basis of a suit under the ATS. That is the long and short of the matter. Should Congress, in the exercise of its legislative discretion, wish to alter the scope of jurisdiction under the ATS, the courts will be bound to follow its direction. But the grave policy considerations which would surely underlie that decision, should not— and did not — drive our conclusion here.[1]

. I concede that the eponymous hero of Captain Blood, Warner Bros. (1935), played by Errol Flynn, did enter into profit-sharing with another pirate.

. I.G. Farbenindustrie Aktiengesellschaft would be one example from the 20th century (though the Nuremberg Tribunal did not indict). Earlier in the century, the human rights abuses in the rubber plantations of the Peruvian Amazon Company were exposed by Roger Casement’s Putumayo Report. That would make, to my knowledge, two instances in the previous century, neither of which was the subject of ATS litigation; so I consider that the doctrinal principle is not of appreciable importance. (The Abir Congo Company, which ran the Belgian Congo for Leopold II, might be a 19 th Century example, except that it was a kind of royal Subchapter S.)

. Judge Leval seeks to continue to debate the logic and coherence of the majority opinion. See Judge Leval’s Opinion Dissenting from Denial of Panel Rehearing 273 n.2. I rest with confidence that those who read the majority opinion will have no trouble understanding why customary international law recognizes individual, but not corporate, criminal liability — and why the ATS, which provides a civil remedy for violations of international law, therefore does not reach corporations.